**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

Deana Vondriska, Jennifer Andrews
Individually and on behalf of other similarly
situated employees,

       Plaintiffs,                        Case No.: 8:07-cv-1322-T-24-TGW

vs.                               **DISPOSITIVE MOTION**
                               **ORAL ARGUMENT REQUESTED**

Gerald Cugno, Paychex Business Solutions, Inc.
and Gevity HR, Inc.,

       Defendants.

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST**
**DEFENDANT PAYCHEX BUSINESS SOLUTIONS, INC.**

      Plaintiffs, pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully file

this motion and memorandum of law moving the Court for an order determining as a matter of

law that Defendant Paychex Business Solutions, Inc. is Plaintiffs' "employer" under the Fair

Labor Standards Act ("FLSA").  The grounds for this motion are set forth in the Declaration of

Matthew H. Morgan, exhibits attached to the Declaration and memorandum of law below.

## INTRODUCTION

      Defendant Paychex Business Solutions, Inc. ("PBS") is Plaintiffs' "employer" under the

intentionally broad definition of "employer" found in the FLSA.  The economic realities of the

relationship with Premier Mortgage Funding, Inc. ("Premier") and its employees make clear that

Plaintiffs were economically dependent on PBS.  PBS's president admitted that at times PBS

shared employer responsibilities with Premier.  Moreover, PBS held itself out as Plaintiffs'

employer to the federal government, various state agencies, and third-party insurers.  PBS was also actively involved in the day-to-day operations of Premier's business by providing human resource services and administering payroll, workers' compensation, and health benefits administration.  PBS conducted weekly training sessions for Premier employees; answered employee and management questions on workplace issues; consulted on classification decisions under the FLSA; and at all times retained a contractual and statutory obligation to control Plaintiffs' work, pay Plaintiffs' wages, pay payroll taxes, and hire, terminate, discipline and reassign Plaintiffs.   For these, and all of the reasons that follow, Plaintiffs' motion for partial summary judgment should be granted.

## STATEMENT OF UNDISPUTED FACTS

## I.     DEFENDANT PAYCHEX BUSINESS SOLUTIONS, INC.

Defendant PBS is a professional employer organization[1] that provides a host of services to its clients that includes payroll, benefits and retirement administration as well as workers' compensation and human resource services. (Craig Hill Dep. at 24 (Ex. A).)  Craig Hill, president of PBS, testified that of those services, Premier[2] received from PBS all but the retirement administration benefits. (Id.)  Attached as Exhibit B is a list of PBS employees who performed services for Premier. (Ex. B.)  Such positions included: Senior Human Resource Representatives, New Client Specialists, Payroll Specialists, Client Service Representatives, a PBS Service Supervisor, Safety and Loss Control Representatives, and Benefits Specialists. (Ex. B.)  Hill and Crystal Starr (PBS Senior Human Resource Representative) admitted that persons and positions omitted form Exhibit B included other Human Resource Representatives, as well

---

[1] Plaintiffs understand that another term that has been used to describe the company is "employee leasing company."
[2] The Court may recall that Plaintiffs originally commenced an action against Premier under the FLSA and intended to move to amend the Complaint to add the named Defendants in this case to the original action.  Premier filed bankruptcy, which prompted a stay of the original lawsuit.  Thus, Plaintiffs commenced this subsequent lawsuit.

as Tax Specialists and a Garnishment Specialist. (Hill Dep. at 112, 119; Crystal Starr Dep. at 80 (Ex. C).)  For the most part, all of these employees serviced Premier and its employees full-time. (Starr Dep. at 81, 89-90, 93.)  While most worked from a PBS office, Nancy Santo (PBS Client Service Representative) had a desk at Premier's corporate offices in Florida and made daily visits to Premier's offices. (Starr Dep. at 12; Ex. B.)

The professional relationship between PBS and Premier began in January 2005, ended in approximately August 2007, and was governed by a Client Services Agreement ("CSA"). (Id. at 25-26.)  The first CSA was executed on November 5, 2004 and governed the relationship beginning in January 2005. (Id. at 30; Ex. D.)  The second CSA (which contained slight modifications) was executed in the fall of 2005 and governed the remainder of the professional relationship. (Id. at 30-33; Ex. E.)  Premier was PBS's largest client. (Hill Dep. at 103.)

## II.     THE CLIENT SERVICES AGREEMENT[3]

### 1.     PBS Fulfilled All Obligations and Met All Requirements to Premier Under the CSA.

The CSA generally describes the duties of PBS to Premier. (Hill Dep. at 34.)[4]  PBS performed all of its obligations and requirements under the CSA with Premier. (Id. at 35, 84, 97.) PBS got paid by Premier to fulfill all of the requirements and obligations to Premier under the CSA. (Id. at 35.)  There is not a requirement or obligation PBS failed to fulfill. (Id.)

Pursuant to the CSA, Premier was required to have all of its employees become "Covered Employees" of PBS. (Ex. D at § 2.01.) Section 2.01 of the CSA provides in part:

> Client agrees and understands that no individual shall become **employed by PBS**, covered by PBS' workers' compensation insurance or be eligible for any other PBS benefit, or be issued a payroll check by PBS, unless and until a properly

---

[3] Both CSAs contain the same relevant terms but are in certain sections difficult to read. Thus, throughout this brief Plaintiffs will cite to the CSA that is easier to read.

[4] See also Ex. F.  Hill described the list contained in Exhibit F as a general description of the duties and responsibilities of PBS to Premier under the CSA. (Hill Dep. at 123-124.)

> completed PBS NEW EMPLOYEE PACKET is delivered to PBS by Client…All employees with properly completed and delivered PBS New Employee Packets shall be considered "COVERED EMPLOYEES" on the effective date stated in the PBS New Employee Packet.

Ex. D (emphasis added.)  Hill acknowledged that PBS shares employment responsibilities with Premier. (Hill Dep. at 43-44.)  Hill testified that if a client retains PBS's services, all of its employees must be Covered Employees. (Id. at 115-16.)

### 2.      Tax, Workers' Compensation, and Health Insurance Services

Hill testified that for the tax, workers' compensation, and health insurance services PBS provided to Premier, PBS was Plaintiffs' employer. (Hill Dep. at 39-43; 66.)[5]

As to the tax services provided, PBS is identified as Plaintiffs' employer on Plaintiffs' W-2 forms. (Ex. G.)  Indeed, the W-2 forms do not even identify Premier as Plaintiffs' employer. (Id.)  PBS has also made representations to various state tax authorities that it is Plaintiffs' employer.  In a letter dated August 16, 2006 from PBS to Michigan's Department of Labor & Economic Growth, for example, PBS stated:

> This letter is to inform you that Premier Mortgage Funding, Inc…has entered into a leasing arrangement with PBS…**Employees previously employed by Premier…are now employed by and reported under PBS**…[.]

(Ex. H.) (emphasis added.)

As to the workers' compensation services, Hill stated, "We act as an employer in that capacity to provide the workers' comp. services to our client." (Hill Dep. at 49.)  To that end, the CSA provides PBS with the sole authority to classify Plaintiffs for purposes of securing workers' compensation insurance:

---

[5] PBS will no doubt try to argue that it was Plaintiffs' "employer of record" as opposed to Plaintiffs' "employer." Plaintiffs maintain there is no distinction between the two, and is merely a desperate attempt by PBS to hide the role PBS played.

> PBS retains the sole authority to establish workers' compensation classification codes for all Covered Employees and Self-employed Individuals based on the information provided to it by Client.

(Ex. D, § 4.01.)  Hill acknowledged that PBS bears the risk, not Premier, with regard to the workers' compensation policy purchased for Plaintiffs. (Hill Dep. at 58-59.)

Finally, as to the health insurance services, PBS submitted documents to Aetna (Plaintiffs' health insurer) wherein PBS held itself out as Plaintiffs' employer. (Id. at 66.)

### 3.   Human Resource Services

PBS provided human resources services to Premier. (Hill Dep. at 24.) The CSA provides in pertinent part:

> Client acknowledges and agrees that it shall cooperate with PBS in implementing human resource policies, training and procedures.

(Ex. E, § 2.10.)  Defendant Cugno (Premier's President and Chief Executive Officer) testified that PBS ran Premier's Human Resources Department. (Gerald Cugno Dep. at 29.)  PBS handled employee complaints; was involved in employee orientation; and did training on how and why people should be paid a particular way. (Id. at 31-36.)  Importantly, Cugno testified that PBS sometimes would classify employees as exempt or non-exempt employees. (Id. at 36.) Cugno believed that it was part of PBS's responsibilities that Premier employees were paid correctly. (Id. at 81.)  Cugno relied on PBS to ensure Premier employees were paid properly. (Id. at 81-82; 106.)  This was one reason why Premier paid PBS. (Id. at 106.)

While PBS disputes Cugno's entire description of its role in providing human resource services, it does acknowledge that it provided trainings to Premier, information regarding classification decisions and the FLSA, and dealt with calls from Premier employees regarding termination issues. (Crystal Starr Dep. at 17, 22, 41-42, 51-52, 56-57.)  Attached as Exhibit J is what Starr uses to describe the human resource services PBS provides to companies like Premier.

(Id. at 23-24; Ex. J.)  Starr described her understanding of the services PBS provided to Premier as follows: human resource consultations (Starr Dep. at 24); supplied posters (Id. at 27); state unemployment insurance services (Id. at 30); and training and seminars (Id. at 36; Ex. J at PBS 00147-153.)[6]

As to human resource consultations, PBS regularly dealt with employee and FLSA-related issues, including employee termination. (Ex. K at PBS-173, 175, 177-181, 183-186, 188, 189, 192, 202, 205, 206, 208, 209, 210, 212, 213, 214, 215, 218, 219,  221, 224, 230, 232, 237-239, 241, 242, 244, 246; Starr Dep. at 57-58.)  Starr acknowledged that she provided Premier with information related to the FLSA and the Code of Federal Regulations. (Starr Dep. at 43.) Exhibit L is a set of FLSA-related documents PBS provided to Premier. (Ex. L)

As to training and seminars, Starr testified that by 2006 she tried to do trainings once a week. (Id. at 49.)  Attached as Exhibit M is a report of the trainings that PBS conducted for Premier employees from 2005 through 2007. (Ex. M.)  Starr conducted trainings at Premier's corporate office and by telephone. (Id. at 17.)  She recalled conducting training for branch employees (like Plaintiffs) over the telephone. (Id. at 18.)  PBS trained Premier employees on the following topics: non-harassment; preventing violence in the workplace; diversity in the workplace; great customer service; hiring practices; performance appraisal training; antidiscrimination training; workplace investigative training; effective discipline and termination training; FLSA training; family medical leave training; and top 10 HR training. (Id. at 20-22; Ex. J at PBS 00147-153.)

---

[6] Starr denied that PBS provided an employee handbook to Premier.  There is evidence to suggest, however, that PBS (and Starr specifically) provided some type of handbook to Premier employees. (Ex. K at PBS 206, 213.) Moreover, according to Jeremy Lube (Premier's Director of Operations), PBS provided Premier with a company handbook that was distributed to all Premier employees and that everyone was required to follow.  (Jeremy Lube Dep. at 57-58 (Ex. N).)

**4.**     **Payroll Administration**

PBS provided payroll administration to Premier employees.  Section 3.01 of the CSA

provides in relevant part:

> PBS assumes responsibility for the payment of wages **without regard to**
> **payment by Client to PBS**.  PBS further assumes full responsibility for the
> payment of payroll taxes and collection of taxes from payroll on Covered
> Employees.  In the event Client does not pay Covered Employees for all services
> rendered, PBS may pay Covered Employees at the minimum wage rate or
> minimum salary provided for in the Fair Labor Standards Act, or any other
> applicable state law.

(Ex. D, § 3.01.) (emphasis added.)  Hill acknowledged that PBS assumes some responsibilities

without regard to payment by Premier. (Hill Dep. at 75.)  Hill testified that there were instances

where Premier branch accounts (the accounts from which PBS would originally try to draw

funds to make payroll) would have insufficient funds and PBS would have to draw on Premier's

corporate account. (Id. at 76-77.)  In such cases, Hill admitted that Premier employees could

have been paid by PBS before PBS drew on Premier's corporate account. (Id. at 78.)

In terms of the payroll administration specifically, once the hours were reported to PBS,

PBS processed the payroll, cut the checks and distributed the checks for Premier employees to

Premier branch locations. (Id. at 103-04.)  Premier would provide the employee hours via the

Internet, telephone or facsimile. (Id. at 126-27.) After the payroll was processed and the checks

distributed, reports were generated by PBS to send to Premier's corporate office. (Id. at 127-28.)

The daily reports included the employee's name, location, workers' compensation code, the

frequency of the payroll, the hire and termination date of the employee, and the FLSA status. (Id.

at 128.)  Finally, PBS retained the authority under the CSA to determine Premier employee pay

rates or the methods of payment. (Id. at 129-30.)

**5.** **PBS's Statutory and Contractual Obligations to Provide Additional Services to Premier**

Section 8 of the CSA is entitled "Statutory Requirements." (Exs. D & E.)  PBS performed all of the statutory requirements under Section 8. (Hill Dep. at 84.)[7]  Many of the requirements are significant to the Court's analysis. Section 8.01 provides:

> PBS retains a right of direction and control over Covered Employees assigned to Client's worksite.

Section 8.02 provides:

> PBS assumes responsibility for the payment of wages to Covered Employees without regard to payment by Client to PBS.

Section 8.03 provides:

> PBS assumes full responsibility for the collection, payment and reporting of payroll taxes on Covered Employees.

Section 8.04 provides:

> PBS retains authority to hire, terminate, discipline and reassign Covered Employees.

Section 8.05 provides:

> PBS retains a right of direction and control over management of safety, risk, and hazard control at the Client's worksite including:
> (a) responsibility for performing safety inspections of Client equipment and premises
> (b) responsibility for the promulgation and administration of employment and safety policies; and
> (c) responsibility for the management of workers' compensation claims, claims filings, and related procedures.

Section 8 of the CSA also contains PBS obligations and requirements that are unique to employees living in certain states.  For employees in Colorado, the CSA provides:

---

[7] Notwithstanding this and all of PBS's other admissions, Hill testified that many of the requirements are part of the CSA merely because they are required per statute and that "the client is ultimately the one that retains the direction over the control of the employees at the site." (Hill Dep. at 86.)

> PBS will provide unemployment insurance as required under the Colorado Employment Security Act…PBS shall maintain employee records relating to Covered Employees and retains responsibility for addressing employee complaints, claims and requests related to employment, except as to worksite responsibilities shared with Client under this Agreement.

(Ex. D, § 8.07.)  Hill testified that PBS would have provided unemployment insurance for Colorado employees.[8] (Hill Dep. at 93.)  Hill also admitted that PBS retained employee records for employees in all states where Premier had a presence. (Id. at 94.)

The CSA precluded Premier from hiring employees in the State of New Hampshire:

> Client acknowledges that, for the term of this Agreement, it may not hire employees in the state of New Hampshire without advance written consent of PBS.

(Ex. D, § 8.10.)

Finally, for employees in Louisiana[9], the CSA provided:

> Authority and responsibility as to other employment matters, including but not limited to hiring, firing, discipline and compensation are allocated to and shall be between PBS and the Client.

(Ex. D, § 8.12.)

## **6.** **More Services that PBS Provided to Premier**

The documentary evidence shows that PBS provided more day-to-day activities or took a more active role on certain workplace topics than what its representatives were willing to admit. For instance, Hill testified that PBS played no role in terminating Premier employees. (Hill Dep. at 112.)  Yet PBS provided a "Paychex Payroll Tips" document to Premier that states:

> You must fill out a **Worksite Employee Change Form** (included) to terminate an employee

> An employee will **NOT** be terminated until a **COMPLETED** Worksite Employee Change Form is received.

---

[8] The first page of the CSA indicates Colorado is a state where Premier has employees. (Ex. D.)
[9] The first page of the CSA indicates that Louisiana is a state where Premier has employees. (Ex. D.)

(Ex. O.)  Hill admitted that PBS gets paid by Premier until it receives a completed work site employee change form that effectively terminates the employee from PBS's system. (Id. at 112-13.)

Hill denied PBS had any control over Premier employees' work. (Hill Dep. at 86.)  In conjunction with Premier, however, PBS sent a memo to "All Premier Mortgage Funding Non-Exempt Employees" on April 20, 2006 that provided:

> This is a reminder that all employee breaks are 15 minutes or less in length. Breaks are considered paid working time.  Because Premier Mortgage Funding compensates you for this time, you must stay on company property during your break.  Failure to do so could result in disciplinary action.

(Ex. P.)

Starr denied assisting in classification decisions for Premier. (Starr Dep. at 44.)  In an email dated June 10, 2005 to others affiliated with PBS, however, Starr states in part: "I am not comfortable to continue to try to fit these employees in a class that DOL has already denied." (Ex. Q.)  In an email dated June 3, 2005 to Raymond Savoy, Starr (discussing the outside sales exemption) stated in part "If they have people that truly fall in this category, I do not know how **we** can refuse to let them use the category." (Ex. R.) (emphasis added.)

PBS regularly provided advice and assisted in decisions that affected rank and file Premier employees like Plaintiffs.  Exhibit K reflects just the sorts of things PBS did as part of its human resource services.  Such services, included, but were not limited to[10]:

- Discussed wage and hour laws on mortgage officers (PBS 175);

- Discussed with branch manager the process of progressive discipline for employees. (PBS 177);

- Delivered and went over materials on the FLSA, exempt and non-exempt, recordkeeping and handbooks with Defendant Cugno (PBS 179);

---

[10] Exhibit K includes more examples of the day-to-day tasks PBS performed for Premier employees.

- Discussed leave of absence issues for employees and how employees should be paid. (PBS 184); and

- Dealt with questions from employees regarding compensation for all hours worked. (PBS 188)

## ARGUMENT

### I.      SUMMARY JUDGMENT STANDARD

Summary judgment shall be entered where the evidence shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  When a party fails to make a showing sufficient to establish there is a genuine issue of material fact for trial regarding an element essential to that party's case, summary judgment shall be entered in the movant's favor.  Beck v. Boce Group, L.C., 391 F.Supp.2d 1183, 1185 (S.D. Fla. 2005) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

Whether an entity is an employer under the FLSA is ultimately a question of law, but requires the district court to make subsidiary factual findings.  Patel v. Wargo, 803 F.2d 632, 634 n.1 (11th Cir. 1986).  In analyzing the evidence, the court is essentially conducting a miniature bench trial.  Martinez-Mendoza v. Champion Int'l Corp., 340 F.3d 1200, 1209 n.27 (11th Cir. 2003).  Where, as here, there are no material facts from which a reasonable fact-finder could find for PBS, Plaintiffs are entitled to judgment as a matter of law.[11]

### II.     THE COURT SHOULD GRANT PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT BECAUSE PBS IS AN EMPLOYER UNDER THE FAIR LABOR STANDARDS ACT.

---

[11] Alternatively, if the Court does find that genuine issues of material fact remain, the Court may deny both parties' motions and reserve its legal determination until it has had the opportunity to assess the evidence and the witnesses' credibility at trial.  See Russell v. Promove, LLC, 2007 WL 2274770, at * 7 (N.D. Ga. Aug. 7, 2007) (denying both parties' motions for judgment as a matter of law regarding individual liability under the FLSA).

The FLSA defines the term "employer" broadly as "any person acting directly or indirectly in the interest of an employer in relation to an employee…" 29 U.S.C. § 203(d) (2002). The Supreme Court has emphasized the "expansiveness" of the FLSA's definition of employer. Falk v. Brennan, 414 U.S. 190, 195 (1973).  Beyond the plain language of the statute, the remedial nature of the statute further warrants an expansive interpretation of its provisions so that they will have "the widest possible impact in the national economy." Carter v. Dutchess Community College, 735 F.2d 8, 12 (2d Cir.1984); see also Lambert v. Ackerley, 180 F.3d 997, 1011-12 (9th Cir. 1999) ("We have held that the definition of 'employer' under the FLSA is not limited by the common law concept of 'employer,' but 'is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes.'") (citing Bonnette v. California Health & Welfare Agency, 704 F.2d 1465, 1469 (9th Cir.1983)), Donovan v. DialAmerica Mktg., Inc., 757 F.2d 1376, 1382 (3d Cir. 1985) (stating that "of all the acts of social legislation" the FLSA has the broadest definition).[12]

A business entity will be considered an employer when the employee is economically dependent on such entity.  Antenor v. D & S Farms, 88 F.3d 925, 929 (11th Cir. 1996). Employer status has been analyzed under the economic realities test using the eight factor test outlined in Antenor.  Id.  The court in Beck v. Boce Group, L.C. articulated the eight factors, derived from Antenor, that are used to determine joint employment under the FLSA:

> (1) the nature and degree of the putative employer's control of the workers; (2) the degree of supervision, direct or indirect, of the work; (3) the right, directly or indirectly, to hire, fire, or modify the workers' employment conditions; (4) the power to determine the workers' pay rates or methods of payment; (5) the preparation of payroll and payment of workers' wages; (6) the ownership of the facilities where the work occurred; (7) whether the worker performed a line job

---

[12] See e.g., United States v. Rosenwasser, 323 U.S. 360, 363 n.3 (1945) (citing 81 Cong.Rec. 7657) (quoting Senator Black who stated on the Senate floor that the term employee under the FLSA has been given "the broadest definition that has ever been included in any one act").

integral to the end product; and (8) the relative investment in equipment and facilities.

391 F.Supp.2d at 1187 (citing <u>Antenor</u>, 88 F.3d at 932).[13]

This test is a creature of common law and focuses on whether the entity's control of the employee's employment. Ultimately, whether an entity is an employer for purposes of the FLSA is decided under federal law. <u>Jeanneret v. Aron's East Coast Towing, Inc.</u>, 2002 WL 32114470, at *4 (S.D. Fla. Jan. 29, 2002).[14]

As discussed below, there is sufficient evidence to support a finding that PBS is an employer using the eight factor <u>Antenor</u> test.

**1.      Antenor factors one through five establish that PBS is an employer under the FLSA.**

*a.      The nature and degree of the putative employer's control of the workers*

The first <u>Antenor</u> factor concerns the amount of control the putative employer exercises over the workers. <u>Antenor</u>, 391 F.Supp.2d at 1187. This factor generally focuses on whether the putative employer exercised day-to-day control over the employee's work and the specific employer decisions that are probative will vary depending on the context. <u>See Jeanneret</u>, 2002 WL 32114470, at *5.

---

[13] There are several principles that help guide the application of the joint employment factors. First, the FLSA specifically allows for joint employer liability so the issue in joint employment cases is not whether an individual was more dependent on one putative employer than another. <u>Antenor</u>, 88 F.3d at 932. Second, no single factor is determinative. Instead, the factors are used to establish the economic reality based on the totality of the circumstances. <u>Id.</u> Third, the degree of the worker's dependence on the putative employer is the main indicator of employment status. Therefore, the relative weight of each of the eight factors depends on how strongly the factor in question shows economic dependency. <u>Id.</u> Fourth, the absence of any one factor does not preclude a finding that the putative employer is jointly liable. <u>Id.</u> at 933. Finally, the FLSA is remedial in nature and should be construed broadly. <u>Id.</u>

[14] All unpublished cases cited in this Memorandum are attached to the Declaration of Matthew H. Morgan as Exhibit S.

PBS exercised control over Plaintiffs' work. First, Florida law required PBS to reserve a right of direction and control over leased employees. Fla. Stat. § 468.525(4)(a). And the CSA clearly provides:

> PBS retains a right of direction and control over Covered Employees assigned to Client's worksite.

(Ex. D, § 8.01.) According to Cugno, PBS handled employee complaints and provided orientation and training for Premier Mortgage's staff. By the summer of 2005, Starr agreed to weekly trainings at Premier's corporate offices. (Starr Dep. at 48-49, 101.) Several of the training sessions Starr facilitated were offered to the entire workforce. (Id. at 21-22.) Also, according to Lube, PBS provided Premier with a company handbook that was distributed to all Premier employees and that every employee was required to follow. (Lube Dep. at 57-58.)

On April 20, 2006, a memo was distributed to Premier employees from PBS and Premier discussing length of employee breaks. (Ex. P.) Furthermore, the CSA stated that Premier was to report allegations of employee misconduct or workplace safety violations to PBS. (Hill Dep. at 74.) Hill testified that PBS has its clients report these incidents to avoid the litigation costs from a potential lawsuit. (Id.)

All of these facts show the first Antenor factor favors a finding of joint employment.

### b.      The degree of supervision, direct or indirect, of the work

The second Antenor factor concerns the amount of supervision the putative employer exercised over the employee's work. Beck, 391 F.Supp.2d at 1188. Importantly, the putative employer may directly supervise the worker or may do so **indirectly** through the client company. Id. The CSA states:

> PBS retains a right of direction and control over Covered Employees assigned to Client's worksite.

(Ex. D, § 8.01.)   The CSA also stated that Premier was to cooperate with PBS in the implementation of human resources policies and procedures.   (Hill Dep. at 72; Ex. E, § 2.10) And, PBS was required by Florida law to retain these rights.   Fla. Stat. § 468.525(4)(a).   Hill explained that PBS provides resources and guidance to help their clients remain in compliance with the rules and regulations applicable to the client's business.   (Id. at 72-73.)

Furthermore, the facts show that PBS assumed a supervisory role by acting as Premier's HR department.   Cugno stated that PBS ran Premier's HR department.   According to Cugno, if people had problems, they reported them to the HR department, which was run by PBS. (Id. at 29-30.)   Lube also stated that he was under the impression that PBS performed HR services on Premier's behalf. (Lube Dep. at 51.)   Also, according to Lube, PBS provided Premier employees with a company handbook that they were required to follow.   (Id. at 57-58.)

It is undisputed that PBS retained a statutory right of control under Florida statute section 468.525(4)(a) and provided extensive human resources related services including frequent training.   (See Ex. K at PBS-173, 175, 177-181, 183-186, 188, 189, 192, 202, 205, 206, 208, 209, 210, 212, 213, 214, 215, 218, 219,  221, 224, 230, 232, 237-239, 241, 242, 244, 246; Starr Dep. at 57-58.)   The facts also show PBS exercised supervisory authority by acting as Premier's human resources department.   Therefore, the second Antenor factor also favors a finding that PBS is Plaintiffs' employer.

        c.        **The right, directly or indirectly, to hire, fire, or modify the workers' employment conditions**

The third factor considers whether the putative employer had the **right** to hire, fire, or modify the employees' work conditions.   Antenor, 88 F.3d at 935.   In Antenor the court found this factor was satisfied when the putative employer retained veto power over the contractor's hiring decisions and dictated what hours employees worked.   Id.

It is undisputed that PBS retained a statutory and contractual right to hire, fire, and modify employees' work conditions.  Florida law requires employee leasing companies to retain "authority to hire, terminate, discipline, and reassign the leased employees."  Fla. Stat. § 468.525(4)(d).  The CSA provides:

> PBS retains authority to hire, terminate, discipline, and reassign Covered Employees.

(Ex. D, § 8.04.)  The CSA also allows PBS to preclude Premier from hiring anyone in living and working in New Hampshire. (Ex. D, § 8.10.)  In addition, PBS exerted indirect control over Premier's hiring practices by providing employee practices and job description training.  PBS also exercised indirect control over termination decisions by providing Premier with one-on-one consultations regarding specific terminations.   For example, representatives of Premier frequently called Starr to ask if they would have to give an employee vacation or severance pay upon termination.  She also spoke with upper management regarding their compliance with the Worker Adjustment and Retraining Notification Act in the event of a mass layoff.  (Starr Dep. at 59-60.)[15]

According to Cugno and Lube, PBS took an active role in the management of employee matters and acted as Premier's HR Department.  (Cugno Dep. at 29; Lube Dep. at 55-56.)  Also, though PBS did not decide when to terminate an employee, PBS did act as a witness when a Premier employee was terminated.  (Cugno Dep. at 33.)  Moreover, Cugno stated "if someone did something so bad off the wall" it is possible that PBS could speak to a Premier department head about having that employee terminated.  (Id.)

PBS exercised control over the right to hire, fire, or modify workers' employment conditions.  PBS retained a statutory right to hire, fire, and modify employees' work conditions

---

[15] See also Ex. O ("An employee will **NOT** be terminated until a **COMPLETED** Worksite Employee Change Form is received."

under Florida Statute section 468.525(4)(d), and took an active role in managing human resource matters.  Therefore, the third Antenor factor favors a finding of joint employment.

### d.      The power to determine the workers' pay rates or methods of payment

The fourth factor concerns the degree of control the putative employer exercised over the workers' pay rates or methods of payment.  Antenor, 88 F.3d at 935.  The Antenor court makes clear that "pay rate refers not only to the amount of compensation to be paid, but includes benefits such as worker's compensation insurance and social security, as well as how these various payments are allocated."  Id. at 936.  Thus, evidence that the putative employer decided which insurance to purchase and named itself as the policy holder is probative of employer status under the FLSA.  Id.

PBS had the power to, and exercised control over, Plaintiffs' rate of pay by administering workers' compensation benefits for Premier.  PBS chose which workers' compensation carrier to use for its client companies and was considered Plaintiffs' employer.  PBS retained the sole authority to determine how it would categorize Plaintiffs for workers' compensation purposes. Because control of workers' compensation benefits is related to employee economic dependence, PBS's control of Plaintiffs' workers' compensation plan is highly probative of its status as Plaintiffs' employer under the FLSA.  PBS also exercised control over Plaintiffs' rate of pay by administering health insurance benefits.  PBS secured health insurance for Plaintiffs and held itself out as Plaintiffs' employer to Aetna – Plaintiffs' health insurance company.

The method of payment also includes the basis on which the employee is paid.  In this context the method of payment centers around who made the determination to pay the loan officers on a salary rather than an hourly basis.  The Jeanneret court held that the fourth factor

favored the putative employer when there was no evidence that the employee leasing company played a role in actually setting the rate of pay.  2002 WL 32114470, at *7.

Unlike the leasing companies in <u>Jeanneret</u> and <u>Beck</u>, PBS exercised authority over Plaintiffs' rate of pay.  Cugno testified that PBS was involved in deciding whether an employee would be classified as exempt or non-exempt. (Cugno Dep. at 36-37.)  Cugno also stated that it was his understanding that part of PBS's job was to make sure people were being paid properly. (<u>Id.</u> at 81.)  In fact, Cugno acknowledged that Premier management went to PBS with questions on how to pay and classify Premier employees.  (<u>Id.</u> at 82.)  Lube also stated that it was his understanding that PBS checked to make sure Premier had properly classified its employees. (Lube Dep. at 37.)  Lube stated that no one at Premier's corporate office would have had the requisite knowledge of the FLSA to correctly classify people, which is why Premier hired PBS. (<u>Id.</u> at 52-53.)  Starr stated that several people at Premier, including Cugno, called her to ask how employees should be classified.  (Starr Dep. at 44.)  She provided them with FLSA resources. (<u>Id.</u> at 44.)  PBS also provided Premier with staff training on the FLSA, including the exempt and non-exempt statuses under the law.  (<u>Id.</u> at 43.)  Finally, Starr's emails in June 2005 and PBS's computer log notes (which repeatedly show the topic of the FLSA being discussed) demonstrate that PBS was actively involved in classification decisions.

PBS exercised authority over the employees' rate of pay.  PBS fielded questions from Premier's upper management regarding employee classification, gave Premier FLSA resources and materials, and provided staff training on the FLSA.  According to Premier's corporate officers, PBS was quite involved in the process of determining Plaintiffs' exemption status, and it was part of PBS's job to make sure Premier had correctly classified its employees.  Also, Hill

stated that PBS did retain a contractual right to determine rates of pay or methods of payment. The fourth factor is highly probative of PBS's status as an employer under the FLSA.

### e.    *The preparation of payroll and payment of workers' wages*

The fifth factor analyzes whether the putative employer was involved in the preparation of payroll and the payment of wages.  <u>Beck</u>, 391 F.Supp.2d at 1191.  This factor is relevant because when a business contracts with another entity to prepare payroll and pay wages, it is likely that the client business itself lacks sufficient economic resources for the employee to solely rely on the client business.  <u>See</u> <u>Antenor</u>, 88 F.3d at 936.  The <u>Jeanneret</u> court also reasoned that when the client employer paid the leasing company in relation to when employees were paid was an important factor.  2002 WL 32114470, at * 8.  If the leasing company paid the workers without regard to whether payment was first received from the client company, this would show that the workers were, in fact, economically dependent on the leasing company.  <u>Id.</u>

Under Florida law employee leasing companies are required to pay their leased employees regardless of whether they have received payment from their client companies.  Fla. Stat. § 468.525(4)(b).  The CSA provides:

> PBS assumes responsibility for the payment of wages to Covered Employees without regard to payment by Client to PBS.

(Exhibit D, § 8.02.)  Like the leasing companies in <u>Beck</u> and <u>Jeanneret</u>, PBS was responsible for the preparation of payroll and the payment of taxes, worker's compensation premiums, and wages.  PBS was also responsible for maintaining a recordkeeping system and would issue a daily report to Premier officials to keep them apprised of employee turnover.  (Hill Dep. at 21-22.)  Moreover, there is evidence that PBS paid Premier's employees without first receiving payment from Premier as part of their actual working relationship.  According to Hill, Premier's branches were sometimes unable to pay PBS the money required for the payment of employee

wages, taxes and other fees.  (Hill Dep. at 76-77.)  PBS would then collect the necessary funds

from Premier's corporate office.  (Id. at 77.)  Hill stated that when exactly PBS would draw from

the corporate account would depend, and in some instances it could have happened after the

Covered Employees had been paid by PBS.  (Id. at 78.)

The fifth factor strongly weighs in Plaintiffs' favor.  PBS maintained records, prepared

payroll, paid employees, and disbursed taxes and worker's compensation on behalf of the

employees.  In addition to performing these responsibilities, PBS may have made these payments

without first being paid by Premier.  Cf. Beck, 391 F.Supp 2d at 1191 (stating that since

plaintiffs did not have any evidence that the leasing company would have made payments to the

plaintiffs regardless of payment by the client company, this factor did not strongly support

plaintiffs).  Unlike the plaintiffs in Beck, Plaintiffs have shown that such advance payment may

have occurred here and even if it did not occur, would have been permissible.  Therefore, the

fifth factor strongly shows Plaintiffs were economically dependent on PBS. [16]

### 2.      PBS's Conduct and Prior Precedent Render PBS an Employer

A number of previous court rulings from this District discussing the impact of

"employer" status in situations when an entity holds itself out to the government and other third

parties as an "employer" solidifies a finding that PBS is an "employer" in this case.  See e.g.,

United States v. Total Employment Co., 305 B.R. 333 (M.D. Fla. 2004), In re Earthmovers, Inc.,

199 B.R. 62 (M.D. Fla 1996).  These decisions are extremely persuasive because they emphasize

the economic benefits these leasing companies gain through their business arrangements with

client companies, making clear that companies like PBS should not be allowed to reap the

---

[16] While there is little evidence on Antenor factors six through eight, they are the least probative of a joint employment relationship as one through five come from Department of Labor regulations and six through eight from case law.  Antenor, 88 F.3d at 932 n.9.

benefits of its business arrangements with companies like Premier while avoiding the responsibilities the agreements impose. Total Employment Co., 305 B.R. at 335.

In Total Employment Co. the court held that an employee leasing company was an employer under 26 U.S.C. § 3401(d)[17] when it had control over the payment of wages and was the entity that actually paid the workers. 305 B.R. at 334. Total Employment Co. ("TEC") was an employee leasing company that filed for Chapter 11 bankruptcy. Id. The IRS filed a proof of claim for unpaid federal employment taxes for employees TEC had leased to American Enterprise Solutions, Inc. ("AESI"). Id. When AESI was unable to provide funds to TEC to make payroll, TEC provided the money for payroll out of its own funds. Id. at 336. But TEC did not pay federal employment taxes. Id. When the IRS initiated efforts to collect, the leasing company argued that the wages paid on AESI's behalf should not be included in its liabilities to the IRS. Id. at 337. The court held that TEC was an "employer" of AESI's employees for statutory purposes and was responsible for the unpaid federal employment taxes. Id. at 341.[18]

The court reasoned that employee leasing companies must accept some of the burdens of the employment relationship along with the many benefits they receive from the arrangement. Id. at 335. One of the responsibilities employee leasing companies have is the withholding of taxes on the employees' behalf. Fla. Stat. § 468.525(4)(c). The court astutely reasoned that as long as "TEC continued to hold itself out as the employee leasing company for the employees" it had to satisfy the statutory and contractual obligation of paying employee taxes. Id. at 341.

---

[17] The term employer means "the person for whom an individual performs or performed any service, of whatever nature…" 26 U.S.C. § 3401(d).

[18] Under 26 U.S.C. § 3401(d)(1) an employer also includes "the person having control of the payment of… wages." The Total Employment Co. court held that because TEC was the entity that exercised actual control over the payment of wages, it was an "employer" for tax purposes. 305 B.R. at 338. The court reasoned that section 3401(d)(1) was designed to hold the entity who actually made the payment responsible for withholding employee taxes. Id. at 339. Therefore the court held that AESI was the workers' common law employer and TEC was their statutory employer, and both of them were responsible to the IRS for withholding taxes, though the client company retains the ultimate payment responsibility. Id. at 341.

In In re Earthmovers, Inc., 199 B.R. 62 (M.D. Fla 1996), the court also considered the issue of whether an employee leasing company was an employer for federal tax purposes. The court noted that a client company cannot contract away its ultimate obligation to pay taxes on behalf of its employees. Id. at 67-68. Importantly, because Florida leasing companies assume a statutory obligation under state law to pay federal taxes, the IRS can look to both the client company and the leasing company for income tax payments. Id. at 67.[19] These statutory obligations make the leasing company and the client company "de facto co-employers" of the workers. Id. Thus, the In re Earthmovers court articulated the principle that Florida employee leasing companies are considered employers under federal law for tax purposes.

In Otte v. United States, 419 U.S. 43 (1974), the United States Supreme Court analyzed who qualifies as an employer under 26 U.S.C. § 3401(d). The Court reasoned that if the entity for whom the services are being performed does not have control over the payment of wages, then the entity with that control will be deemed the statutory employer for the purposes of section 3401(d)(1). Id. Thus, the Court recognized that an entity can be considered the employer for federal law purposes when that individual or entity exercises control over the payment of wages to the employees.

Just as in Total Employment Co., PBS has held itself out as Plaintiffs' employer in a federal context. To fulfill its statutory and contractual obligations, PBS is listed as Plaintiffs' employer on their W-2 forms. By contracting with Premier, PBS benefitted financially from the business arrangement. And as the leasing companies in Total Employment Co. and In re Earthmovers, Inc., PBS also undertook certain responsibilities pursuant to its relationship with Premier—one of which was the recognition that it can be held liable as an employer. Because

---

[19] By holding that the IRS could look both to the client company and the leasing company for tax payments, the In re Earthmovers, Inc. court found that a state statutory obligation gave rise to employer status under federal law. See id.

the definition of employment under the FLSA is so broad, it follows that companies like PBS that hold themselves out as employers for paying taxes and securing employee benefits, renders them employers under the FLSA as well.

### 3.        Previous Cases are Easily Distinguishable

Several Florida district courts analyzing the <u>Antenor</u> factors have found in favor of leasing companies – ruling they were not employers under the FLSA.  <u>See, e.g.,</u> <u>Beck</u>, 391 F.Supp.2d at 1188 ("[t]he economic realities test evaluates the actual working relationship"); <u>Neto v. The Car Salon, L.L.C.</u>, No. 03-61751-CIV-HUCK/TURNOFF (S.D. Fla. Apr. 22, 2007); <u>Salley v. PBS of Central Florida, Inc.</u>, 2007 WL 4365634, at * 3 (M.D. Fla. Dec. 12, 2007); <u>Jeanneret</u>, 2002 WL 32114470, at * 3.

Because these cases are factually distinguishable from this case, and do not properly consider the <u>Antenor</u> factors, these decisions are not persuasive here.  First, the plaintiffs in these cases simply did not have sufficient factual evidence to substantiate the practical economic reality of the relationship.  Second, these courts emphasized the importance of the actual working relationship between the putative employer and the workers, and largely ignored (without any justifiable explanation) the contractual obligations to which the employee leasing companies agreed to perform and got paid for performing, as well as the statutory obligations that required companies like PBS to perform certain obligations to be considered an employee leasing company.  The <u>Antenor</u> factors specifically focus on the "nature" of the control held by the entity, and its "right" and "power" to exert control, not exclusively on whether they exercise that "right" or "power."  As such the contractual and statutory obligations imposed on PBS must be considered when analyzing the economic reality of the employment relationship.

To ignore the contractual and statutory obligations renders the CSA – and the resulting representations by PBS to a number of governmental agencies and third-party vendors that it is an "employer" – a sham.   PBS cannot be allowed to unreasonably gain a benefit from an "employer" designation, without adhering to its responsibilities that go with that designation. The economic reality is that a CSA was executed by PBS that required PBS to perform all of the obligations imposed on it.   Hill acknowledged the same.   Given this economic reality, such important contractual and statutory obligations must be considered, which render the previous decisions cited in this Section easily distinguishable.

<u>**CONCLUSION**</u>

Plaintiffs' motion for partial summary judgment against Defendant PBS should be granted as the undisputed evidence shows that Defendant PBS is an employer under the FLSA. RESPECTFULLY SUBMITTED this 1st day of May, 2008.

**NICHOLS KASTER & ANDERSON, PLLP**

s/ Matthew H. Morgan
Donald H. Nichols, MN Bar No. 78918*
Paul J. Lukas, MN Bar No. 22084X*
Matthew H. Morgan, MN Bar No. 304657*
4600 IDS Center
80 South 8th Street
Minneapolis, MN  55402
Telephone (612) 256-3200
Fax (612) 215-6870
* Admitted *pro hac vice*

Matthew Fenton, Fla. Bar No. 0002089
WENZEL & FENTON, P.A.
633 N. Franklin Street, Suite 500
Tampa, Florida 33602
Telephone (813) 224-0431
Fax (813) 229-8712
mfenton@wenzelfenton.com

ATTORNEYS FOR PLAINTIFFS


## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that a true and correct copy of the foregoing document has been filed with the Clerk of the Court on May 1, 2008 by using the CM/ECF system which will send a notice of electronic filing to:

Matthew Fenton
WENZEL & FENTON, P.A.
633 N. Franklin Street, Suite 500
Tampa, FL 33602

Benjamin James Mollo
PREMIER MORTGAGE FUNDING
3001 Executive Dr., Suite 330
Clearwater, FL 33762

Edward Diaz
Erika R. Royal
HOLLAND & KNIGHT, LLP
701 Brickell Ave - Ste 3000
Miami, FL 33131-5441

Eric P. Berezin
Toni Read
DUANE MORRIS LLP
1180 West Peachtree Street, Ste. 700
Atlanta, GA  30309

s/Matthew H. Morgan
Matthew H. Morgan