UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DEANA VONDRISKA and
JENNIFER ANDREWS

      Plaintiffs,

v.                         CASE No. 8:07-CV-1322-T-24TGW

PAYCHEX BUSINESS SOLUTIONS,
INC.. and GERALD CUGNO,

      Defendants.

_____

## REPORT AND RECOMMENDATION

      The plaintiffs allege that defendant Paychex Business Solutions, Inc. ("PBS"), violated the Fair Labor Standards Act ("FLSA") by failing to pay them minimum and overtime wages. The plaintiffs and PBS have filed cross-motions for summary judgment on the threshold issue of whether PBS was the plaintiffs' employer under the FLSA.

      Because the plaintiffs have failed to show that they were economically dependent on PBS for their livelihood, PBS was not their employer under the FLSA. Accordingly, I recommend that PBS's Motion for

Summary Judgment (Doc. 96) be granted, and the plaintiffs' Motion for Partial Summary Judgment against defendant PBS (Doc. 99) be denied.

I.[1]

A. Plaintiffs Deana Vondriska and Jennifer Andrews were employed as loan officers by Premier Mortgage Funding, Inc. ("Premier"), a mortgage lender whose corporate headquarters is located in Clearwater, Florida (Doc. 119-2, p. 1, ¶ 8). Prior to filing for bankruptcy, Premier had approximately 500 affiliated branch locations in 42 states (id.). Vondriska worked as a loan officer in Premier's Middleburg Heights, Ohio, office from January 2005 until May 2005 (Doc. 108-2, p. 6).[2] Andrews was employed as a loan officer in Premier's Indianapolis, Indiana, branch from the Fall of 2004 until August 2005 (Doc. 97-4, p. 9).

In November 2004, Premier contracted with defendant PBS, an employee leasing company, to provide Premier with payroll processing,

_____

[1]The plaintiffs' citations to the depositions of Gerald Cugno and Jeremy Lube are not mentioned in this fact summary or the legal analysis because, as explained in section IV, their deposition testimony was given in another lawsuit to which PBS was not a party and cannot be considered against PBS.

[2]Pagination refers to the page numbers assigned on the CM/ECF document.

employee benefits, and human resources services (Doc. 101-2, ¶¶ 4, 5; Doc. 96-2). The terms of their agreement are memorialized in a Client Service Agreement ("CSA") (Doc. 96-2).

Thus, PBS, for a fee paid by Premier, issued Premier's employees their payroll checks and paid the applicable taxes and workers' compensation insurance premiums (see id., ¶¶ 3.01, 4.01, 7.01).[3] However, Premier funded the payroll, and PBS issued checks based on Premier's reports of the hours worked by the employees (id., ¶¶ 2.06, 7.03; Doc. 101-2, ¶ 17; Doc. 99-3, pp. 40-41).

PBS also provided to Premier human resources services. It regularly provided training on human resources topics such as discrimination, harassment, workplace violence, customer service, performance appraisals, and the Family Medical Leave and Fair Labor Standards Acts (Doc. 97-3, ¶ 4; Doc. 99-5, pp. 9-11; Doc. 99-19). Further, Premier managers and supervisors consulted with PBS regarding human resources questions (Doc.

---

[3]Pursuant to the agreement, all Premier employees were required to complete a new employee packet, upon which they would be considered PBS "covered employees" and eligible for PBS's services (Doc. 96-2, ¶ 2.01; Doc. 101-2, ¶¶ 7-9; see. e.g., id., p. 5). Further, PBS was listed as an employer of record for taxes, workers' compensation and health insurance (Doc. 99-3, pp. 13, 14, 17-18).

97-3, ¶ 8). In this regard, PBS viewed its function as providing Premier with "guidance and information" to help Premier maintain compliance with rules and regulations (Doc. 99-3, p. 23; see also Doc. 97-3, ¶ 12).

PBS did not, however, exercise control over the day-to-day activities of Premier employees (Doc. 99-3, p. 35; Doc. 101-2, ¶¶ 10-16). Thus,

- PBS did not recruit, interview or hire the plaintiffs (Doc. 101-2, ¶¶ 8, 11, 16).

- PBS did not determine their job descriptions or train them regarding their job duties (id., ¶¶ 14, 16).

- PBS did not determine their wages (id., ¶¶ 11, 14, 16).

- PBS did not determine their work hours or assign tasks (id., ¶¶ 10, 11, 14, 16).

- PBS did not play any role in determining the manner or means by which they accomplished their work assignments (id., ¶¶ 10, 12, 16).

- PBS did not supervise or evaluate their work (id., ¶¶ 11, 14).

- PBS did not discipline or terminate them (id., ¶¶ 11, 14, 16).

Also, the relationship between PBS and Premier workers was to last only as long as Premier wanted it to (id., ¶ 15). Thus, if Premier ended its contract with PBS, Premier employees would remain employed by Premier, but no longer have any association with PBS.

Additionally, neither plaintiff recalls having any contact with PBS during their employment (Doc. 96-6, p. 4, ¶ 5; Doc. 97-4, p. 13; Doc. 108-2, p. 9). Rather, the plaintiffs stated that their branch managers hired them, assigned their job duties, set their work hours and compensation, and supervised them (Doc. 96-6, pp. 4-5, ¶¶ 6-8; Doc. 97-4, pp. 9-12, 16-18; Doc. 108-2, pp. 6-10). Further, the plaintiffs worked at Premier's branch offices, which were not owned or controlled by PBS (Doc. 101-2, ¶¶ 12, 13). PBS, moreover, was not involved in the termination of their employment. Thus, Vondriska's employment was terminated by her branch manager, and Andrews resigned (Doc. 97-4, p. 12; Doc. 108-2, p. 6). In sum, PBS provided no services to the plaintiffs other than the administration of payroll.

As an employee leasing company, PBS was required under Florida law to retain certain rights and responsibilities regarding Premier employees. See Fla. Stat., §468.520, et seq. Those requirements were

-5-

included in the CSA (see Doc. 96-2, ¶ 8). Among other things, PBS was required to retain "a right of direction and control over," and the "authority to hire, terminate, discipline, and reassign," Premier employees (id., ¶¶ 8.01, 8.04). Further, it assumed responsibility for the payment of their wages and payroll taxes without regard to whether Premier paid PBS (id., ¶¶ 8.02, 8.03). PBS did not, however, exercise control over Premier employees because it believed that, if it attempted to control the employees' day-to-day activities, the client would not want to do business with PBS (see Doc. 99-3, pp. 33-35, 52-53). Further, PBS averred that "[a]t no time during the business relationship between Premier and PBS was PBS forced to pay Premier employees due to Premier's failure to pay its employees properly" (Doc. 101-2, ¶ 17).

The relationship between PBS and Premier ended in approximately August 2007 (Doc. 99, p. 3). When it was terminated, PBS's relationship with Premier employees ended, but Premier workers remained employed by Premier (see Doc. 101-2, ¶ 15).

B. The plaintiffs originally filed a lawsuit in this court against Premier, alleging that it violated the FLSA by failing to pay the plaintiffs

minimum and overtime wages (Case No. 8:06-CV-1492-T-27MAP, Doc. 1).

On July 3, 2007, Premier filed for bankruptcy (id., Docs. 70, 74). The day

prior to Premier's bankruptcy filing, the plaintiffs filed a motion to amend

their complaint to add as defendants PBS, Gerald Cugno (Premier's CEO),

and Gevity HR, Inc. (an employee leasing company that provided payroll

services to Premier prior to PBS) (id., Doc. 69). However, due to Premier's

bankruptcy, the case was administratively closed, and all pending motions

denied as moot (id., Doc. 74).

Consequently, the plaintiffs filed this lawsuit against defendants

PBS, Cugno, and Gevity HR, Inc., alleging that they violated the FLSA by

failing to pay the plaintiffs minimum and overtime wages (Docs. 1, 78).[4] The

plaintiffs seek recovery of unpaid back wages, liquidated damages, and their

attorneys' fees and costs (Doc. 78, p. 5). They also seek to certify this matter

as a class action (id.).

PBS disputes that it was the plaintiffs' "employer" under the

FLSA. Consequently, it moved to bifurcate discovery into two phases in

---

[4]The plaintiffs and Gevity HR, Inc., filed a stipulation to dismiss with prejudice the plaintiffs' claim against Gevity HR, Inc. (Doc. 132), which was approved by the court (Doc. 133). Therefore, any references to "the defendants" pertain to PBS and Cugno.

order to determine this threshold issue before litigating the merits of the lawsuit (Doc. 43). The court granted the motion to bifurcate, noting that "resolution of a preliminary motion [on the employer] issue may dispose of the entire action" (Doc. 62, pp. 2-3).

In accordance with the scheduling order (id.), the parties conducted discovery on the issue of whether the defendants were employers under the FLSA and subsequently filed motions for summary judgment on this issue (Docs. 96, 99). The motions were referred to me for a report and recommendation (Doc. 112). Oral argument was then held on these motions (see Doc. 143).

## II.

The court shall enter summary judgment only if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R.Civ.P. 56(c). Material facts are those over which disputes "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Id. The movant bears the burden of establishing the absence of a dispute over

material facts. Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 469

(11th Cir. 1993).

When the party opposing the summary judgment motion has the

burden of proof at trial, the moving party may discharge its initial burden by

identifying specific portions of the record which show the absence of

evidence to prove the nonmoving party's case at trial, or, alternatively, it may

come forward with "affirmative evidence demonstrating that the nonmoving

party will be unable to prove its case at trial." United States v. Four Parcels

of Real Property, 941 F.2d 1428, 1437-38 (11th Cir. 1991).[5]  If the moving

party does not meet its burden, then the motion for summary judgment will

be denied. Id.

When the moving party meets its initial burden, the burden then

shifts "to the non-moving party to demonstrate that there is indeed a material

issue of fact that precludes summary judgment." Clark v. Coats & Clark,

Inc., 929 F.2d 604, 608 (11th Cir. 1991). If the party opposing the motion is

unable to make a sufficient showing on an element essential to its case on

---

[5]The plaintiffs have the burden of proving that the defendants are their employers.
Martinez-Mendoza v. Champion Int'l Corp., 340 F.3d 1200, 1209 (11th Cir. 2003).

which it has the burden of proof at trial, the movant is entitled to summary judgment. United States v. Four Parcels of Real Property, supra, 941 F.2d at 1438.

When the party moving for summary judgment has the burden of proof at trial, it must affirmatively show the absence of a genuine issue of material fact by presenting credible evidence that would entitle it to a directed verdict if the evidence was not controverted at trial. Id. If the moving party does not meet its burden, then the motion for summary judgment will be denied. Id. at 1437-38. If the movant meets its initial burden, then it is entitled to summary judgment unless the nonmoving party comes forward with "significant probative evidence demonstrating the existence of a triable issue of fact." Id. at 1438.

In determining whether the moving party should be awarded summary judgment, the court must view the evidence and factual inferences therefrom in the light most favorable to the opposing party. Reynolds v. Bridgestone/Firestone, Inc., supra, 989 F.2d at 469. Any reasonable doubts about the facts are to be resolved in favor of the party opposing the motion for summary judgment. Id.

III.

As indicated, the plaintiffs allege that PBS violated the Fair
Labor Standards Act ("FLSA"), 29 U.S.C. 201, et seq., by failing to pay them
minimum and overtime wages (Doc. 78, pp. 1, 4). They also allege that PBS
failed to document, report and preserve records of their work hours (id., p. 4).

The issue presented by the plaintiffs' and PBS's motions for
summary judgment is whether PBS was the plaintiffs' "employer" under the
FLSA. 29 U.S.C. 203(d); Patel v. Wargo, 803 F.2d 632, 635 (11th Cir.
1986)(Liability under the FLSA is predicated upon the existence of an
employer-employee relationship.). The plaintiffs allege that they were
employed jointly by Premier and PBS. PBS argues that it was not the
plaintiffs' employer.

In Antenor v. D&S Farms, 88 F.3d 925, 929 (11th Cir. 1996), the
Eleventh Circuit discussed the FLSA's broad definition of "employer." It
stated:

> In defining "employment" under [the FLSA],
> Congress expressly rejected the common-law
> definition of employment, which is based on

> limiting concepts of control and supervision.
> Rather, an entity "employs" a person under the
> FLSA ... if it "suffers or permits" the individual to
> work. An entity "suffers or permits" an individual
> to work if, as a matter of economic reality, the
> individual is dependent on the entity.

(citations omitted; emphasis added). Further, "it [is] clear that a worker can be economically dependent on, and thus jointly employed by, more than one entity at the same time." Id.; see also 29 C.F.R. 791.2.

"[T]he existence of a joint employment relationship depends on the 'economic reality' of all the circumstances." Antenor v. D&S Farms, supra, 88 F.3d at 932 (emphasis in original). The parties agree that the eight factors identified in Antenor guide this determination (see Doc. 96, p. 9; Doc. 99, p. 12).[6] These factors are (88 F.3d at 932):

> (1) the nature and degree of the putative employer's
> control of the workers;

---

[6]In Antenor, the Eleventh Circuit determined whether agricultural workers were jointly employed by a farm grower and labor contractor. Although Antenor is factually distinct, the factors identified in that case are also used to determine whether an employee leasing company is a joint employer under the FLSA. See, e.g., Jeanneret v. Aron's East Coast Towing, Inc., 2002 WL 32114470 (S.D. Fla. 2002)(unpub. dec.); aff'd, 54 Fed. Appx. 685 (11th Cir. 2002)(unpub. dec.).

(2) the degree of supervision, direct or indirect, of the employees' work;

(3) the right, directly or indirectly, to hire, fire, or modify the workers' employment conditions;

(4) the power to determine the workers' pay rates or methods of payment;

(5) the preparation of payroll and payment of the workers' wages;

(6) the ownership of the facilities where the work occurred;

(7) whether the workers performed a line-job integral to the end product; and

(8) the relative investment in equipment and facilities.

No one factor is determinative, and "each factor should be given weight according to how much light it sheds on the nature of the economic dependence of the putative employee on the employer." Perdomo v. Ask 4 Realty & Management, Inc., 2008 WL 4682616 at *1 (11th Cir. 2008) (unpub. dec.); see also Antenor v. D&S Farms, supra, 88 F.3d at 932.

Applying the Antenor factors, several district courts within the Eleventh Circuit have held that employee leasing companies that provided payroll administration and/or human resources assistance, similar to this case, are not joint employers under the FLSA because such services do not establish the employee's economic dependence on the employee leasing company. See Jeanneret v. Aron's East Coast Towing, Inc., 2002 WL 32114470 (S.D. Fla. 2002)(unpub. dec.); aff'd, 54 Fed. Appx. 685 (11th Cir. 2002)(unpub. dec.); Salley v. PBS of Central Florida, Inc., 2007 WL 4365634 (M.D. Fla. 2007)(unpub. dec.); Neto v. The Car Salon, LLC and PBS of Central Florida, Inc., Case No. 03-61751-CIV-HUCK/TURNOFF (S.D. Fla. 2004)(unpub. dec.) (Doc. 96-5); Beck v. Boce Group, L.C., 391 F.Supp.2d 1183, 1188 (S.D. Fla. 2005). Notably, the Salley and Neto decisions involve PBS.

Application of the Antenor factors in this case shows that the services provided by PBS were primarily administrative in nature, and that the plaintiffs were economically dependent upon Premier, not PBS, for their livelihood. Therefore, as a matter of law, PBS was not the plaintiffs' employer under the FLSA.

-14-

1. Nature and degree of the putative employer's control of the workers.

The first indicator of joint employer status is the putative employer's control over the employee. Such control arises when the putative employer determines, for example, "the number of workers hired for a job, when work should begin on a particular day, which workers should be assigned to specific tasks, and whether a worker should be disciplined or retained." Antenor v. D&S Farms, supra, 88 F.3d at 933-34.

PBS presented evidence that it did not exercise any control over the plaintiffs' work. In particular, PBS did not determine whether the plaintiffs should be hired or fired, what their work hours would be, what tasks they were to perform or how to do them, or whether the plaintiffs should be disciplined (Doc. 101-2, ¶¶ 8, 10-14, 16). Rather, the plaintiffs testified that their Premier branch managers held these responsibilities (see Doc. 97-4, pp. 9-12, 16-19; Doc. 108-2, pp. 6-10).

The plaintiffs argue that PBS exerted control by providing human resources training (Doc. 99, p. 14; Doc. 105, p. 8). However, the plaintiffs did

not receive any training from PBS (see Doc. 97-4, p. 16; Doc. 108-2, p. 9).[7]
Further, the plaintiffs do not explain how PBS's training, comprised of 30-90
minute sessions of information and best practices advice on human resources
topics (see Doc. 97-3, ¶¶ 5, 12; Doc. 99-5, pp. 9, 22-24), establishes that PBS
controlled Premier employees. See Aimable v. Long and Scott Farms, 20 F.3d
434, 441 (11th Cir. 1994), cert. denied, 513 U.S. 943 (1994) (Control arises
when the putative employer goes "beyond general instructions ... and begins
to assign specific tasks, to assign specific workers, or to take an overly active
role in the oversight of the work."); see, e.g., Neto v. The Car Salon, LLC and
PBS of Central Florida, Inc., supra (finding that the employee leasing
company did not control the workers even though it provided human resources
training and assistance); Salley v. PBS of Central Florida, Inc., supra (same).[8]

---

[7]Human resources training was primarily provided to managerial and supervisory staff (Doc. 99-5, p. 9).

[8]The plaintiffs also argue (Doc. 99, p. 14) that PBS's control is exemplified by an April 20, 2006, memorandum distributed from Premier and PBS to Premier employees, which stated that employees are limited to fifteen minute breaks (Doc. 99-22). There is no evidence either plaintiff received this memorandum. Indeed, PBS asserts that there is no evidence that the memorandum was sent to any Premier employee or that PBS had any involvement with it (Doc. 107, p. 6). Regardless, this general memorandum regarding break time is not probative of PBS's control over the plaintiffs. See Aimable v. Long and

The plaintiffs rely greatly (with respect to several _Antenor_ factors) upon provisions of the CSA and Florida statutory requirements for the licensing of employee leasing companies to show that PBS is a joint employer. Fla. Stat., §468.520, et seq. With regard to the first _Antenor_ factor, the plaintiffs argue that PBS's control over the plaintiffs is evidenced by the contract and statutory requirement that "PBS retain[] a right of direction and control" over Premier workers (Doc. 99, p. 14; Doc. 96-2, ¶ 8.01)(emphasis added). Florida law requires that employee leasing companies include this provision in the client agreements. See Fla. Stat., §468.525(4)(a).

Several district courts in the Eleventh Circuit have addressed this argument. Jeanneret v. Aron's East Coast Towing, Inc., supra, 2002 WL 32114470; Beck v. Boce Group, L.C., supra, 391 F.Supp.2d 1183; Neto v. The Car Salon, LLC and PBS of Central Florida, Inc., supra (Doc. 96-5). These courts have held that the terms of a contract or "[t]he provisions of a state law regulating the employment relationship are only relevant to the extent that the

_____

Scott Farms, supra, 20 F.3d at 441.

parties actually followed those requirements." Jeanneret v. Aron's East Coast Towing, Inc., supra, 2002 WL 32114470 at *4.[9]

Thus, while acknowledging that the provisions of the Florida statute and the CSA would tend to belie an employee leasing company's assertions that it is not an employer, the Jeanneret decision explained (id.):

> [W]hether an entity is in fact an employer under the FLSA is a question of federal law....The Supreme Court and the Eleventh Circuit have indicated that in determining whether an employment relationship exists, the court must examine the actual working relationship between the parties to find whether the worker was economically dependent on the alleged employer.

After examining the actual working relationship between the parties, the court in Jeanneret determined that those statutory and contractual provisions were not probative of a joint relationship under the FLSA because the parties did not, in practice, follow them. Id. at **5-8. The Eleventh Circuit affirmed the

---

[9]In Jeanneret, the plaintiff brought FLSA claims for unpaid overtime wages against the towing company he worked for, and Sunshine Companies, an employee leasing business that provided services to the towing company. The Jeanneret court rejected the plaintiff's contention that contractual and statutory provisions identical to those in this case established that Sunshine was a joint employer.

Jeanneret decision "substantially for the reasons set forth in the district court's Order." Jeanneret v. Aron's East Coast Towing, Inc., App. Dkt. No. 02-11323 (Nov. 15, 2002) (Court Exhibit).  See also Antenor v. D&S Farms, supra, 88 F.3d at 932 (citation omitted) ("[T]he focus of each inquiry ... must be on each employment relationship as it exists between the worker and the party asserted to be a joint employer.").

Similar to Jeanneret, PBS's retention of a right to control and direct PBS workers pursuant to the CSA and Florida state law fails to show a joint employment relationship because the plaintiffs have failed to show that PBS, in practice, exercised control over them.  PBS explained that, although it was required under Florida law to retain a right of control, they did not exercise control because PBS did not want to risk losing its clients (see Doc. 99-3, pp. 52-53).

In sum, the plaintiffs have failed to establish that PBS exercised control over them.  Although the plaintiffs rely greatly on the CSA and Florida statutory provisions that require PBS to retain a right of control over Premier workers, these provisions lack probative value because they do not

reflect the actual working relationship between PBS and the plaintiffs. Accordingly, consideration of this factor supports a finding that PBS was not a joint employer.

### 2. Degree of supervision of the work.

This factor examines whether the putative employer is involved in more than "infrequent assertions of minimal oversight." Antenor v. D&S Farms, supra, 88 F.3d at 935. Supervision is present whether the orders are communicated directly by the putative employer to the worker, or indirectly through another individual. Id. at 934.

PBS argues that it "did not, in any way, supervise Plaintiffs' work" (Doc. 96, p. 11). In this connection, PBS presented evidence that it did not determine the plaintiffs' job duties, oversee their performance, or discipline them (Doc. 101-2, ¶¶ 10-11, 14, 16). Rather, the plaintiffs were supervised by their branch managers (see Doc. 96-6, p. 5, ¶ 8; Doc. 96-7, p. 4, ¶ 6; Doc. 97-4, pp. 16-19; Doc. 108-2, pp. 9-10).

The plaintiffs argue that PBS supervised Premier workers by providing human resources training and responding to human resources

questions (see Doc. 99, p. 15). However, there is no evidence that PBS provided any training to, or even conferred with, either plaintiff in this case (Doc. 97-4, p. 16; Doc. 108-2, p. 9). Furthermore, the plaintiffs have not shown that PBS's training and consultations, which consisted of information and best practices advice on human resources topics, constituted supervision of Premier employees' work. See Aimable v. Long and Scott Farms, supra, 20 F.3d at 441 (supervision is more than "infrequent assertions of minimal oversight").

The plaintiffs argue that PBS's supervisory authority is exemplified by CSA and statutory provisions which required PBS to retain a right of direction and control over Premier workers, and required Premier to cooperate with PBS regarding human resources policies and procedures (Doc. 99, pp. 14-15 (citing CSA §§ 2.01, 8.01; Fla. Stat., §468.525(4)(a)). However, as indicated, it is evidence of actual supervision, not inchoate contractual and statutory rights, that is to be considered in determining whether there was a joint employment relationship. See Jeanneret v. Aron's East Coast Towing, Inc., supra, 2002 WL 32114470 at *6 (rejecting the contention that Florida

-21-

statutory requirements satisfied this factor because there was no evidence that the employee leasing company actually supervised the plaintiff's work). Therefore, the second factor also favors PBS's contention that it was not the plaintiffs' employer.

### 3. Right to hire, fire, or modify employment conditions.

This factor pertains to the putative employer's right, directly or indirectly, to hire, fire or modify employment conditions, such as working hours. Antenor v. D&S Farms, supra, 88 F.3d at 935. On its face, this factor appears to aid the plaintiffs. Thus, the CSA contains the statutorily mandated provision that PBS "retains authority to hire, terminate, discipline and reassign" Premier employees (Doc. 96-2, ¶ 8.04; Fla. Stat., §468.525(4)(d)). However, the CSA also states that Premier "acknowledges and agrees that it shall exercise control and supervision over the day-to-day duties of Covered Employees and their job sites .... [and] expressly absolves PBS of control over the day-to-day duties of the Covered Employees and over [their] job sites." (Doc. 96-2, ¶ 2.02). In all events, the mere right to hire, fire or modify employment conditions set forth in the CSA and statute carries little weight

since an employer's status is dependent upon the actual working relationship between PBS and Premier. Jeanneret v. Aron's East Coast Towing, Inc., supra, 2002 WL 32114470 at *6; see also Beck v. Boce Group, L.C., supra, 391 F.Supp.2d at 1190 (reliance on contractual provisions without other evidence indicating that the employer possessed the right to hire, fire or modify employment conditions is unavailing).

In this case, there is no evidence that PBS was involved in the hiring or termination of either plaintiff's employment. Further, there is no evidence that PBS played any role in determining, or modifying, the plaintiffs' employment conditions. Rather, the plaintiffs' branch managers hired them and decided their working hours (see Doc. 96-6, p. 5, ¶ 7; Doc. 96-7, p. 3, ¶ 2; Doc. 97-4, pp. 9-10, 17-18; Doc. 108-2, pp. 6-7, 11-12). Ultimately, Vondriska's employment was terminated by her Premier branch manager, and Andrews resigned (Doc. 97-4, p. 12; Doc. 108-2, p. 6).

The plaintiffs argue that "PBS exerted indirect control over Premier's hiring practices by providing employee practices and job description training" (Doc. 99, p. 16). However, PBS did not create any job

-23-

descriptions for Premier workers; rather, it trained Premier on how Premier could create job descriptions (Doc. 99-5, pp. 22-23).[10] Further, PBS's training, the "function [of which was] to provide [Premier] with guidance and information" (Doc. 99-3, p. 23), does not establish that PBS made employment decisions regarding any employee.

The plaintiffs argue further that "PBS also exercised indirect control over termination decisions by providing Premier with one-on-one consultations regarding specific terminations" (Doc. 99, p. 16). There is no evidence that Premier consulted with PBS regarding the terms of either plaintiff's employment. Regardless, the plaintiffs have not shown that, through these "consultative" services (Doc. 99-5, pp. 31-32) PBS exerted control over whether to terminate a Premier employee. See Beck v. Boce Group, L.C., supra, 391 F.Supp.2d at 1189-90 (serving as a consultant on

---

[10]In this regard, Crystal Starr, PBS's senior human resources representative, testified that she advised Premier employees of the importance of a job description and "what a job description is comprised of so ... when they go to create one ... they [know] what they need to put in it (Doc. 99-5, pp. 22-23). The provision of this general information clearly does not provide probative evidence of an actual working relationship.

employment issues is not evidence that the defendant was involved in the termination of employees).[11]

Here, as in Jeanneret and Beck, the plaintiffs have failed to show that, in terms of their actual working relationship, PBS exercised the power to hire, fire, or modify the working conditions of Premier workers. Under these circumstances, the contractual and statutory right to hire, terminate, discipline, and reassign Premier's employees provides no meaningful weight in the determination of whether Premier's employees were, in fact, economically dependent upon PBS.

---

[11]The plaintiffs, in support of their contention that PBS exerted indirect control over terminations, emphasize that Premier asked Starr whether Premier was required to give a terminated employee vacation or severance pay (Doc. 99, p. 16). However, this question does not show that PBS was involved in the decision to terminate the worker's employment. Furthermore, Starr responded that she would not be able to answer this query because she did not know Premier's policy on severance or vacation pay (Doc. 99-5, pp. 31-33). Therefore, this communication provides no support for the plaintiffs' contention that PBS participated in the termination of Premier's employees.

The plaintiffs also assert the unpersuasive argument that a "Paychex Payroll Tips" memorandum (Doc. 99-21), which stated that an employee will not be terminated until a completed worksite employee change form is received." is evidence of PBS's involvement in the termination of an employee (Doc. 99, p. 16, n.15). This memorandum merely reflects an administrative function that is necessary to remove the individual from PBS's payroll system so that Premier would no longer incur an administrative fee for that person on the payroll (Doc. 99-3, p. 43). It does not show that PBS decided whether the employee would remain employed by Premier.

### 4. Power to determine pay rates or methods of payment.

This factor considers the putative employer's power to set rates, and methods of payment. "[P]ay rate refers not only to the amount of compensation to be paid, but includes benefits such as worker's compensation insurance and social security." Antenor v. D&S Farms, supra, 88 F.3d at 936. Method of payment refers to the basis upon which a worker is paid, such as by the hour or commission. Id.

This factor, like the previous one, literally refers to the power to set rates and methods of payment, rather than to what actually occurs between the parties. However, unlike the previous factor, the plaintiffs do not point to any language in the CSA or a statute that gives PBS the power to determine pay rates or methods of payment (see Doc. 99, pp. 17-19; Doc. 105, p. 14). While they do note that the CSA gives responsibility to pay employees wages without regard to payment by Premier to PBS, that provision is beside the point since it does not give PBS power to determine pay rates or methods of pay.

Moreover, although the plaintiffs seek to rely upon the circumstances of PBS's relationship with Premier and its employees, those circumstances provide only minimal support of the plaintiffs' position. Most important, PBS did not, in fact, determine the amount of the plaintiffs' wages or the method of payment (Doc. 101-2, ¶¶ 11, 14). See Aimable v. Long and Scott Farms, supra, 20 F.3d at 442 ("[m]ost important[]" is who determines the amount of wages and method of payment). Thus, the plaintiffs stated that their branch managers told them that they would be paid on a commission basis and the percentage of the commissions (Doc. 97-4, pp. 10-11; Doc. 108-2, pp. 6-7).

PBS did exercise some control over the plaintiffs' pay rate in that it purchased workers' compensation insurance for them, and it deducted from their paychecks the applicable social security, federal and state taxes.[12]

---

[12]The plaintiffs also allege that "PBS secured health insurance for [them] and held itself out as ... Plaintiffs' health insurance company (Doc. 99, p. 17). It is noted, however, that Vondriska declined any health benefits from Premier (Doc. 108-2, p. 16) and Andrews stated that she did not receive any (Doc. 97-4, p. 13). Regardless, such an act is not substantially probative of a joint employment relationship because PBS provided such benefits only in an administrative capacity (see Doc. 96-2, ¶ 6.01) (stating that "PBS shall perform administrative services" for the health care plan and that Premier is "solely responsible for the amounts due for benefits elections made by Covered Employees" in the

-27-

However, PBS's payment of social security and other government taxes is only minimally supportive of joint employment because the funds for those deductions were provided by Premier and, hence, this was merely an administrative function. See Jeanneret v. Aron's East Coast Towing, Inc., supra, 2002 WL 32114470 at **7-8; Beck v. Boce Group, L.C., supra, 391 F. Supp.2d at 1191.

The plaintiffs argue that PBS's purchase of workers' compensation insurance is highly probative of PBS's status as an employer because it is related to the employees' economic dependence on PBS (Doc. 99, p. 17). In Antenor, the court found significant the grower's purchase of workers' compensation insurance because the labor contractor "lacked the economic wherewithal" to buy the insurance. 88 F.3d at 936. However, the plaintiffs in this case have not adduced any evidence that Premier's

---

event that the covered employees' wages are insufficient to cover the cost of the benefit election).

contractual arrangement with PBS to purchase workers' compensation insurance was due to Premier's financial inability to purchase that insurance.[13]

The plaintiffs also contend that PBS exercised authority over the plaintiffs' rate of pay because "PBS was involved in deciding whether an employee would be classified as exempt or non-exempt" (Doc. 99, p. 18). However, the plaintiffs present no probative evidence that PBS determined their, or any other Premier worker's, FLSA classification.

In this connection, PBS presented evidence that it provided Premier with FLSA resources and best-practices advice, but that it did not decide loan officers' exemption status (Doc. 99-5, pp. 23-25; Doc. 97-3, ¶¶ 10-12; see, e.g., Doc. 99-13, p. 6). Starr explained that it was not PBS's role to make the exemption determinations and, further, that she lacked the knowledge to make such determinations, as she did not manage the employees or know what their job duties entailed (Doc. 97-3, ¶¶ 7, 10-12). Rather, it was

---

[13]For example, employers may contract with employee leasing companies to provide such services for administrative convenience and economies of scale. See, e.g., Cruz-Lovo v. Ryder System, Inc., 298 F. Supp.2d 1248, 1249-50 (S.D. Fla. 2003), aff'd, 88 Fed.Appx. 381 (11th Cir. 2003) (unpub. dec.).

Premier's responsibility to determine FLSA classifications  (see Doc. 99-5, pp. 23-24; Doc. 101-2, ¶ 9; see also Doc. 96-6, NKA 000001 (memorandum to "Employees of Premier Mortgage Funding, Inc.," which states that "Branch Managers need[] to classify every branch employee as either an outside sales employee or a non-exempt employee")(emphasis added)).[14]

PBS did not exercise any power to determine pay rates or method of payment.  To the extent that the plaintiffs have considered PBS's handling of tax deductions and purchasing of workers' compensation insurance under this factor, rather than under the next factor regarding preparation of payroll, those actions provide, at most, minimal support for the plaintiffs' position.

---

[14]In support of the plaintiffs' contention that Starr made decisions on FLSA classifications, the plaintiffs emphasize two e-mails between Starr and Premier management (Doc. 105, p. 9).  However, those e-mails actually support PBS's contention that it did not make FLSA determinations.  Thus, in an e-mail dated June 3, 2005, Starr responds to correspondence from Premier regarding the outside sales classification (under which an employee would be exempt from FLSA wage regulations) and states, "If they have people that truly fall in this category, I do not know how we can refuse to let them use the category" (Doc. 99-24).  Further, in an e-mail dated June 10, 2005, Starr states that she is concerned that PBS is being asked to make judgment calls on the outside sales classification, and that she is "not comfortable to continue [sic] and try to fit these employees in a class that DOL has already denied" (Doc. 99-23).  These e-mails indicate that Premier, not PBS, determined the FLSA classifications, and that Starr disagreed with those decisions.

### 5. Preparation of payroll and payment of wages.

This factor, which is related to the determination of pay rates, is considered probative of joint employment because "when a business undertakes to help an [employer] prepare its payroll and pay its wages, it is likely that the [employer] lacks economic substance on which the workers can solely depend." Antenor v. D&S Farms, supra, 88 F.3d at 936. However, when payroll services are provided by a leasing company as an administrative convenience, such as when the employer funds the payroll, they are only minimally probative of a joint employment relationship. See, e.g., Jeanneret v. Aron's East Coast Towing, Inc., supra, 2002 WL 32114470 at *8 (the employee leasing company's payment of employee wages, taxes, and workers' compensation premiums from its own accounts was "little evidence" of joint employment because the client funded the payroll); Beck v. Boce Group, L.C., supra, 391 F.Supp.2d at 1191 (payment of wages and benefits only "minimal evidence" of joint employment because client funded the payroll); see also Neto v. The Car Salon, LLC and PBS of Central Florida, Inc., supra (Doc. 96-5)(preparation of payroll did not render employee economically dependent

upon the leasing company); <u>Salley</u> v. <u>PBS of Central Florida, Inc.</u>, <u>supra</u>, 2007 WL 4365634 (same).

In this case, it is undisputed that PBS prepared and issued payroll checks to Premier employees and paid the applicable insurance and taxes. PBS argues, however, that its role was that of administrative "check cutter." Thus, PBS prepared the payroll checks based on information provided by Premier, and the funds for the payroll were obtained from Premier before the payroll checks were issued (Doc. 99-3, pp. 27, 40-41; Doc. 101-2, ¶ 17).[15]

---

[15]The plaintiffs emphasize that a leasing company's issuance of payroll checks before receiving payment from the client is significant in determining a worker's economic dependence on the payroll company (Doc. 99, pp. 19-20). See <u>Jeanneret</u> v. <u>Aron's East Coast Towing, Inc.</u>, <u>supra</u>, 2002 WL 32114470 at *8. However, the probative evidence in this case is that PBS did not advance payroll funds to Premier employees. Thus, the Premier branches or Premier's corporate office funded the payroll, and the plaintiffs have not identified any instance when checks were issued to Premier employees before PBS received from Premier payment for those wages (<u>see</u> Doc. 99-3, p. 27; Doc. 101-2. ¶ 17).

The plaintiffs also argue that PBS could have been compelled under Florida law to pay the leased employees if they had not received payment from Premier (Doc. 99, p. 19; Doc. 105, pp. 7-8). Although PBS was under such an obligation, <u>see</u> Doc. 96-2, ¶ 8.02; <u>Fla. Stat.</u>, §468.525(4)(b), the pertinent issue is whether the employee leasing company in fact advanced the payroll funds, not whether it could have been compelled to do so. <u>Jeanneret</u> v. <u>Aron's East Coast Towing, Inc.</u>, <u>supra</u>, 2002 WL 32114470 at *8 (giving little weight to this statutory provision because the employee leasing company did not make payroll payments without first receiving the funds from the client); <u>Beck</u> v. <u>Boce Group, L.C.</u>, <u>supra</u>, 391 F. Supp.2d at 1191.

Under these circumstances, PBS's payroll services are not a strong indicator of employer status because PBS's payroll services were primarily administrative and do not show that Premier lacked economic substance on which the workers solely depended. See Antenor v. D&S Farms, supra, 88 F.3d at 936 (payment of payroll probative of joint employment when it indicates a lack of "economic substance" on which the workers can solely depend"); Perdomo v. Ask 4 Realty & Management, Inc., supra, 2008 WL 4682616 at *1 ("each factor should be given weight according to how much light it sheds on the nature of the economic dependence of the putative employee on the employer"). The ministerial nature of PBS's services is exemplified by Andrews's testimony that she did not even know when PBS took over payroll functions from Premier's prior employee leasing company, Gevity HR, Inc. (Doc. 97-4, p. 28).[16]

---

[16]The plaintiffs argue that the identification of PBS as the plaintiffs' employer of record for tax and workers' compensation purposes also shows that PBS was the plaintiffs' employer under the FLSA (Doc. 99, pp. 20-23). This argument has been rejected by district courts within the Eleventh Circuit. See, e.g., Cruz-Lovo v. Ryder System, supra, 298 F.Supp.2d at 1258, n.8 (the listing of the putative employer's tax identification number on the workers' tax forms did not demonstrate an employment relationship because it did not address the working relationship between the putative employer and the workers); see also Jeanneret v. Aron's East Coast Towing, Inc., supra, 2002 WL 32114470 at **7-8 (the

### 6. Ownership of facilities where work occurred.

This factor is probative of joint-employment status because the worker might not have work without those facilities, and "a business that owns or controls the worksite will likely be able to prevent labor law violations." Antenor v. D&S Farms, supra, 88 F.3d at 937. PBS did not own the facilities where the plaintiffs, or any other Premier employees, worked (Doc. 101-2, ¶ 13). This fact demonstrates Premier's independent economic status and supports the conclusion that the plaintiffs were not economically dependent on PBS. See Jeanneret v. Aron's East Coast Towing, Inc., supra, 2002 WL 32114470 at *8.

### 7. Performance of a line-job integral to business.

---

employee leasing company's administration of taxes and workers' compensation premiums was not dispositive of whether it was an employer under FLSA).

In support of their contention, the plaintiffs cite to inapposite IRS cases (Doc. 99, p. 20), one of which was vacated. Otto v. United States, 419 U.S. 43 (1974); Total Employment, 305 B.R. 333 (M.D. Fla. 2004); In re Earthmovers, 199 B.R. 62 (M.D. Fla. 1996), vacated, 242 B.R. 49 (M.D. Fla. 1999). These cases are unpersuasive because they analyze whether an employee leasing company is liable as an employer for unpaid federal employment taxes under 26 U.S.C. 3401(d), a statute which is not an issue in this case and distinctly defines an employer as "the person having control of the payment of ... wages." 26 U.S.C. 3401(d)(1).

Another indicator of an employment relationship is the plaintiffs' performance of a job that is integral to the putative employer's business. Antenor v. D&S Farms, supra, 88 F.3d at 937. This factor is probative of joint employment because a worker who performs a task that is a normal and integral phase of the putative employer's business is likely to be dependent on the putative employer. Id.

This factor also favors PBS, as the plaintiffs' duties as loan officers were integral to Premier's business as a mortgage company, not to PBS's business (Doc. 101-2, ¶ 18). Thus, the tasks performed by the plaintiffs inured to the benefit of Premier, not PBS (id., ¶ 12).

### 8. Investment in equipment and facilities.

The final factor is the degree of investment in equipment and facilities by the putative employer. Antenor v. D&S Farms, supra, 88 F.3d at 937. This factor is probative of an employment relationship because it is more likely that a worker is economically dependent on the entity that supplies the equipment or facilities necessary to perform their work. Id. PBS had no ownership of the equipment or facilities used by Premier workers (Doc. 101-2,

¶13). Therefore, this factor also supports PBS's contention that it is not a joint employer.

In sum, both quantitatively and qualitatively, the <u>Antenor</u> factors support the finding that, as a matter of law, PBS was not a joint employer of Premier workers. Thus, in terms of the actual employment relationship, PBS exercised no control over the plaintiffs' work or wages, and had no ownership interest in the job performed by the plaintiffs, or the facilities and equipment they used to perform their jobs. Rather, their role was limited to providing human resources information and payroll services for a fee which, under the circumstances of this case, are insufficient to create a joint employment relationship because they do not show the plaintiffs' economic dependence on PBS.

Further, as indicated, several district courts within the Eleventh Circuit have rejected the contention that the types of services provided by PBS render an employee leasing company a joint employer under the FLSA. In <u>Neto</u> v. <u>The Car Salon, LLC and PBS of Central Florida, Inc.</u>, the plaintiff worked for The Car Salon as a laborer, and PBS provided payroll, human

resource, and employee benefits services to The Car Salon. Case No. 03-61751-CIV-HUCK/TURNOFF (unpub. dec.)(Doc. 96-5). Specifically, PBS would (id., p. 3):

> issue paychecks to employees on its own account in amounts and as dictated by Car Salon, pay related employment taxes to the governmental agencies, pay workers' compensation premiums, and pay unemployment compensation taxes. The Client Services Agreement incorporated the requirements of Fla. Stat. §468.525(b), which obligated PBS to pay Car Salon's employees' wages regardless of whether Car Salon provided payroll funds to PBS.

Neto contended further that PBS (id., pp. 4-5):

> provid[ed] a new employee packet to all Car Salon employees ... provid[ed] a PBS employee handbook to all Car Salon employees ... advis[ed] the employees that PBS was available to answer their questions regarding benefits, payroll and human resources issues ... directly advis[ed] Car Salon employees regarding benefits, workers' compensation and other matters ... requir[ed] the employees to report to PBS any incidents of sexual harassment or other violations of federal and state employment laws ... provid[ed] Car Salon with human resources assistance and training and ... prepar[ed] the payroll for Car Salon and pa[id] wages to Car Salon employees.

United States District Judge Paul C. Huck rejected Neto's contention that these services rendered PBS a joint employer and granted summary judgment in favor of PBS (id., pp. 10-11). He acknowledged that "PBS performed human resources and other administrative functions as contracted in the Client Services Agreement," but stated that the economic reality was that PBS did not exercise control over the plaintiff and that the Car Salon employees were economically dependent on Car Salon (id.). The types of services PBS provided in Neto are virtually indistinguishable from those provided in this case.

In Salley v. PBS of Central Florida, Inc., supra, 2007 WL 4365634, a physician's office hired PBS to provide "employee leasing and payroll services." The plaintiff in Salley submitted an affidavit which stated that (1) PBS trained her regarding her job and in several human resources topics such as work place hazards, loss prevention and control, and disaster planning; (2) PBS paid her and was listed as her employer on her pay stubs; (3) she addressed her questions and concerns regarding her wages to PBS; and (4) she received a handbook from PBS, the contents of which PBS reviewed with

her and made sure she understood (Case No. 6:07-CV-1517-GAP-KRS, Doc. 22-2).

United States District Judge Gregory A. Presnell held that PBS was not a joint employer under the FLSA and therefore granted summary judgment in PBS's favor, stating that these services did not show PBS had control over the plaintiff's employment or that the plaintiff was economically dependent upon PBS. Salley v. PBS of Central Florida, Inc., supra, 2007 WL 4365634 at *3. These are the same types of services that were provided in this case. Arguably, the circumstances in Salley are more indicative of an employment relationship because Salley had direct and frequent contact with PBS, whereas in this case the plaintiffs had no contact with PBS, and they were not even sure of PBS's functions (see Doc. 97-4, pp. 13, 20-21; Doc. 108-2, p. 9).

The plaintiffs argue vaguely that these decisions are factually distinguishable (Doc. 99, p. 23). However, in Salley and Neto PBS provided payroll administration, employee benefits, and human resources assistance, which are the same services provided in this case. Further, the district courts

in Neto, Beck and Jeanneret addressed the significance of contractual provisions and statutory requirements that were identical to those in this case. Therefore, the plaintiffs have failed to show that these cases should be disregarded because they are factually distinguishable.

The plaintiffs argue further that these decisions are unpersuasive because their legal analyses are flawed. In this regard, they argue that the district courts improperly (Doc. 99, pp. 23-24):

> emphasized the importance of the actual working relationship between the putative employer and the workers, and largely ignored ... the contractual obligations to which the employee leasing companies agreed to perform and got paid for performing, as well as the statutory obligations that required companies like PBS to perform certain obligations to be considered an employee leasing company.

However, the Jeanneret decision, which held that it is the parties' actual working relationship that governs the employer analysis under the FLSA, was affirmed by the Eleventh Circuit "substantially for the reasons set forth in the district court's Order." Jeanneret v. Aron's East Coast Towing, Inc., supra. App. Dkt. No. 02-11323 (Court Exhibit). That analysis,

furthermore, is in accord with the caselaw.  See Antenor v. D&S Farms, supra, 88 F.3d at 932 ("[T]he focus of each inquiry ... must be on each employment relationship as it exists between the worker and the party asserted to be a joint employer."); Usery v. Pilgrim Equipment Co., Inc., 527 F.2d 1308, 1312 (5th Cir. 1976), cert. denied, 429 U.S. 826 (1976)(In determining liability under the FLSA. "[i]t is not significant how one 'could have' acted under the contract terms. The controlling economic realities are reflected by the way one actually acts."); Mednick v. Albert Enterprises, Inc., 508 F.2d 297, 302 (5th Cir. 1975)(cautioning against "undue reliance given to bare legal powers" and stating that relationships deriving from corporate identities established under state law will not be controlling for ascertaining whether the relationship is employment under the FLSA).  Therefore, the plaintiffs' argument that the Jeanneret, Salley, Beck and Neto cases should not be followed because their legal analyses are flawed is unpersuasive.

At oral argument, the plaintiffs asserted that Tullous v. Texas Aquaculture Processing Co., LLC, 579 F.Supp.2d 811 (S.D. Tex. 2008), supported their contention that PBS was an employer under the FLSA.

-41-

Tullous, however, is factually and legally distinguishable from this case. Furthermore, Tullous does not support the plaintiffs' contention that they are entitled to judgment as a matter of law because the Tullous court held only that genuine issues of material fact existed which precluded summary judgment on the employer issue.

In Tullous, the employees of a catfish processing plant alleged that ProSource, a staff leasing agency which leased employees to work at the fish processing plant, was their employer under the FLSA. ProSource claimed that it had little to do with the day-to-day operations other than payroll responsibilities and maintenance of employee records. Id. at 814. However, the Tullous plaintiffs presented evidence that they remained employees of ProSource if the catfish processing plant terminated them, and that ProSource determined whether they received overtime. Id. at 820. These factual circumstances, which do not exist in this case, are significant because they evidence the employee's economic dependence on ProSource as both a source

-42-

of work, and as to the amount of their wages.[17]  Further, the <u>Tullous</u> decision is legally distinguishable because it did not follow all of the <u>Antenor</u> factors. <u>See</u> <u>id</u>.

In sum, the plaintiffs have not shown that they were economically dependent upon PBS.  Rather, the evidence reflects an agreement between Premier and PBS to provide Premier administrative payroll services and consultative human resource services for a fee.  There is no evidence that PBS played any role in determining whether either plaintiff obtained, or kept a job at Premier, or what their working conditions would be.  The plaintiffs' services as loan officers were of no benefit to PBS's business.  PBS had no ownership investment in Premier, the facilities where the plaintiffs worked, or the equipment they used.  Significantly, if the relationship between Premier and PBS ended, the plaintiffs would have remained employed by Premier, not PBS. Therefore, PBS is entitled to judgment as a matter of law because it was not the plaintiffs' employer.

---

[17]The court in <u>Tullous</u> specifically stated that the circumstances in its case were factually distinguishable from <u>Beck</u>.  579 F.Supp.2d at 820 n.9.  As has been indicated. <u>Beck</u> is on point with the facts of this case.

IV.

As indicated in footnote one, this report and recommendation does not refer to the deposition testimony of Premier CEO Gerald Cugno or Premier's operations chief Jeremy Lube. PBS objected to consideration of this testimony because it was given in <u>Vondriska</u> v. <u>Premier Mortgage Funding, Inc.</u>, 8:06-CV-1492-T-27MAP, a case in which it was not a party (Doc. 109). PBS also argued that other evidence presented by the plaintiffs is inadmissible. The plaintiffs have filed a memorandum in opposition to PBS's objections (Doc. 116; <u>see</u> <u>also</u> Doc. 105, pp. 15-20).[18] PBS's objections should be sustained with regard to the Cugno and Lube depositions because Rule 32, F.R.Civ.P., precludes consideration of this testimony.

---

[18]The plaintiffs assert the unmeritorious contention that PBS's objections should be denied as procedurally deficient because the memorandum is not titled a motion to strike (<u>see</u> Doc. 116, pp. 1, 4-5). None of the caselaw cited by the plaintiffs holds that it is procedurally inappropriate to object to inadmissible evidence. To the contrary, the plaintiffs' citation to <u>Wells</u> v. <u>XPEDX</u>, 2007 WL 2696566 (M.D. Fla. 2007(unpub. dec.), supports the propriety of PBS's objections. <u>See</u> <u>id</u>. at *1 ("To properly challenge the admissibility of evidence submitted in support of a summary judgment motion, a party should object rather than move to strike.").

Rule 32(a), F.R.Civ. P., governs the use of depositions in court proceedings. It provides:

> (1) In General. At a hearing or trial, all or part of a deposition may be used against a party on these conditions:
>
> (A) the party was present or represented at the taking of the deposition or had reasonable notice of it;
>
> (B) it is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying; and
>
> (C) the use is allowed by Rule 32(a)(2) through (8).

Thus, three conditions must be satisfied in order to consider Cugno's and Lube's deposition testimony against PBS in this action. PBS argues, among other things, that the first condition is not satisfied because "PBS was neither present nor represented at the depositions, nor did PBS receive any notice of the depositions, as required by Rule 32(a)(1)(A)" (Doc. 109, p. 5). The plaintiffs offer no evidence controverting this statement.[19] Therefore, because

---

[19]The plaintiffs' argument that PBS could have deposed Cugno and Lube in this case does not satisfy the requirements of Rule 32(a)(1)(A), F.R.Civ.P. (Doc. 116, p. 7). Further, the plaintiffs also could have deposed Cugno and Lube in this case, but decided not to do so. Since the plaintiffs are the parties that wish to utilize the testimony, their

the plaintiffs have failed to satisfy a requirement of Rule 32(a)(1), F. R.Civ. P., the depositions of Cugno and Lube may not be considered against PBS.

The plaintiffs argue at length that these depositions may be considered because they purportedly would be admissible at trial under Rule 807 of the Federal Rules of Evidence. The plaintiffs' analysis misses a crucial step.

> In considering the use of depositions at a trial or hearing, it is helpful to remember that the problem has two aspects. First, the conditions set forth in Rule 32(a) must exist before the deposition can be used at all. Second, when it is found that these conditions authorize the use of the deposition, it must be determined whether the matters contained in it are admissible under the rules of evidence.

8A Wright, Miller & Marcus, Federal Practice and Procedure, §2142, p. 159. Thus, the plaintiffs' argument regarding the admissibility of the depositions under the Federal Rules of Evidence does not cure the fundamental deficiency that Rule 32(a)(1)(A), F.R.Civ.P., has not been satisfied. Furthermore, it is noted that the plaintiffs' citation to United States v. Skilling, 2006 WL

---

contention that they should be permitted to use this testimony in this case because PBS failed to depose Cugno and Lube in this case is specious.

1155566 (S.D. Tex. 2006)(unpub. dec.), does not warrant a different result because Rule 32(a)(1)(A) was satisfied in that case. See id. at *1 (the party against whom the prior trial testimony was offered against was a party to those prior proceedings).

Consequently, PBS's objections regarding consideration of the depositions of Cugno and Lube are properly sustained.[20]

## V.

For the foregoing reasons, I recommend that PBS's Motion for Summary Judgment (Doc. 96) be granted, and that the plaintiffs' Motion for Partial Summary Judgment against defendant PBS (Doc. 99) be denied.

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: JANUARY 23, 2009

---

[20]PBS also argued in their objections that three other exhibits offered by the plaintiffs should be excluded from consideration. Since those exhibits do not show that PBS is an employer under the FLSA, objections to that evidence need not be addressed.

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal. 28 U.S.C. 636(b)(1).